UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR LEE,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>MARRIOTT INTERNATIONAL, INC., et al.,<br><br>　　　Defendants. | Case No. 25-cv-01169-EMC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 33 |

Plaintiff Taylor Lee has filed suit against several affiliated defendants: (1) Marriott International, Inc. ("MII"); (2) Marriott International Administrative Services, Inc.; (3) Starwood Hotels & Resorts Worldwide, LLC (a wholly owned subsidiary of MII that manages, *inter alia*, the Westin Maui); and (4) Samuel Spurrier (an employee at the Westin Maui). Ms. Lee was an employee at the Westin Maui until early January 2024 when she resigned. Ms. Lee maintains that she was constructively discharged. Her main claims are that she was discriminated against her on the basis of pregnancy, pregnancy disability, and gender and that she was retaliated against for making complaints about the discrimination.

Now pending before the Court is Defendants' motion to compel arbitration. Having considered the parties' briefs and accompanying submissions, the supplemental filings ordered by the Court, and the oral argument of counsel, the Court hereby **DENIES** Defendants' motion to compel.

**I.   FACTUAL & PROCEDURAL BACKGROUND**

In her complaint, Ms. Lee alleges as follows.

The entity defendants are part of an "integrated enterprise known to the world" as Marriott.

Compl. ¶ 13. Marriott is a hotel chain. MII is "the parent company of several hotel companies" that fall under the Marriott umbrella, including the Ritz-Carlton and Westin hotels. Compl. ¶ 13.

Ms. Lee has a long history with Marriott (including entities that later became part of the Marriott umbrella). Back in 2004, at the age of only seventeen, she worked for the Ritz-Carlton Half Moon Bay (which later merged into Marriott). *See* Compl. ¶ 20. In the years that followed, Ms. Lee worked off and on for different Marriott entities. *See* Compl. ¶¶ 21-22. In 2015, she became the Director of Transient Sales at the Ritz-Carlton San Francisco. *See* Compl. ¶ 23. Then, beginning in November 2020, she was the Director of Transient Sales at the Westin Maui.[1] She remained in that position until she resigned in early 2024. *See* Compl. ¶¶ 20-23.

According to Ms. Lee, while she was working at the Westin Maui, she suffered employment discrimination – in particular, related to her pregnancy. Ms. Lee became pregnant in 2022. In late 2022, when Ms. Lee was about eight weeks into the pregnancy, she told her supervisor at the time, Lana Uytterhagen, that she was pregnant, that she was expecting twins, and that the pregnancy was a high-risk one. *See* Compl. ¶ 29. Thereafter, in the following weeks, "[Ms.] Uytterhagen questioned whether [Ms. Lee] could continue in her role as a sales director before or after taking maternity leave and giving birth." Compl. ¶ 31.

Subsequently, Ms. Lee informed her manager and Human Resources that she would be taking leave early because of the high-risk and complicated pregnancy. *See* Compl. ¶ 33. Libby Child was hired as Ms. Lee's temporary replacement for the time that Ms. Lee would be out on pregnancy and maternity leave. *See* Compl. ¶ 35. Ms. Lee began pregnancy disability leave on March 1, 2023, and gave birth to her twins in late March. *See* Compl. ¶¶ 34, 44.

In April 2023, Mr. Spurrier was hired, apparently to replace Ms. Uytterhagen who had resigned. *See* Compl. ¶ 46. Thus, Mr. Spurrier became Ms. Lee's supervisor. (As noted above, Mr. Spurrier is one of the named defendants.)

Meanwhile, Ms. Lee was suffering pregnancy-related health complications following the

---

[1] Although Ms. Lee worked at the Westin Maui, she was a remote employee and resided in California. *See* Compl. ¶ 25.

2

birth of the twins and thus her leave was extended. *See* Compl. ¶¶ 48-49, 51. Although she was out on leave, Mr. Spurrier expected Ms. Lee to continue to work. *See* Compl. ¶ 53. When Ms. Lee formally returned to work in late 2023, she suffered various adverse employment actions. For example, Mr. Spurrier refused to return her to the role that she previously had: he reduced her responsibilities, reduced her accounts, gave her clients to Ms. Child, and excluded her from meetings. *See, e.g.*, Compl. ¶¶ 59, 68-70, 75. Mr. Spurrier also imposed new travel requirements that Ms. Lee could not meet given her lactation and childcare needs and failed to input sales goals and performance metrics that were necessary in order for Ms. Lee to be considered for merit ratings and an annual increase in pay. *See, e.g.*, Compl. ¶¶ 60-65, 71-74. In addition to the above, Mr. Spurrier made comments that were hostile to working mothers. *See* Compl. ¶ 79 (alleging that Mr. Spurrier "repeatedly told [Ms.] Lee and the greater Sales Team at the hotel that he was resentful of his past Manager for a long time because she was an 'every[]day Mom,' while he was only able to be a 'Saturday Dad'" because he had to "pick[] up the slack for her"). Ms. Lee made complaints (*e.g.*, to Mr. Spurrier himself and the hotel General Manager) about how she was being treated, but to no avail. *See* Compl. ¶¶ 66, 88-89.

By November 2023, Ms. Lee went on unpaid medical leave because of the "discriminatory workplace" and the failure to address such. Compl. ¶ 96. Ms. Lee formally resigned in 2024. *See* Compl. ¶ 5. She maintains that she was constructively discharged.

Based on, *inter alia*, the above allegations, Ms. Lee has asserted the following causes of action:

- Employment discrimination based on pregnancy, pregnancy disability, and gender, in violation of FEHA and Title VII (Counts 1 and 2).
- Discrimination in violation of the federal Pregnant Workers Fairness Act ("PWFA") (Count 3).
- Retaliation and interference in violation of the PWFA (Count 4).
- Retaliation in violation of Title VII and FEHA (Counts 5 and 6).
- Retaliation in violation of California Labor Code § 1102.5 (whistleblower retaliation) (Count 7).

3

- Failure to prevent discrimination and retaliation in violation of FEHA (Count 8).
- Denial of rights and interference in violation of the California Family Rights Act ("CFRA") and the Family and Medical Leave Act ("FMLA") (Counts 9 and 11).
- Retaliation in violation of the CFRA and FMLA (Counts 10 and 12).

Now pending before the Court is Defendants' motion to compel arbitration. Defendants move to compel arbitration based on an agreement that Ms. Lee signed while she was working at the Ritz-Carlton San Francisco.

## II.  DISCUSSION

A.  Legal Standard

The Federal Arbitration Act ("FAA") provides in relevant part that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. Defendants contend that the FAA is applicable to the instant case; Ms. Lee does not disagree per se but does argue, as discussed below, that there was no agreement to arbitrate.

B.  General Overview

Both parties have submitted evidence in conjunction with Defendants' motion to compel arbitration. The Court addresses such evidence, where necessary, in its analysis. As an initial matter, however, the Court provides a general overview of the parties' arguments because they provide context for the evidence submitted.

The general overview is as follows. Ms. Lee has worked off and on for a Marriott entity since 2004. In October 2015, she became the Director of Transient Sales for the Ritz-Carlton San Francisco. While working at the Ritz-Carlton San Francisco, Ms. Lee allegedly entered into an arbitration agreement. She left the Ritz-Carlton San Francisco in October 2020, and shortly thereafter she began to work for the Westin Maui in Hawaii, also as the Director of Transient Sales. Defendants have moved to compel the instant dispute with the Westin Maui based on the prior arbitration agreement entered into with the Ritz-Carlton San Francisco.

Ms. Lee argues that the arbitration agreement is inapplicable because she suffered

4

employment discrimination at the Westin Maui, not the Ritz-Carlton San Francisco, and, even though both hotels are Marriott entities, she had a break in employment between two. According to Ms. Lee, her employment with the Ritz-Carlton San Francisco ended on October 30, 2020, and she did not begin to work at the Westin Maui until about a week later – on November 7, 2020. Ms. Lee maintains that, during that one-week period, she was not employed by any Marriott entity. Thus, the arbitration agreement that she purportedly entered into while working at the Ritz-Carlton San Francisco is irrelevant to her employment at the Westin Maui.

Defendants disagree. Defendants claim that Ms. Lee was never terminated from the Ritz-Carlton San Francisco, and so there was no break in employment – *i.e.*, she simply transferred from one Marriott entity to another.

According to Ms. Lee, even if Defendants are right that there was simply a transfer, the Court should still deny the motion to compel arbitration for independent reasons. For example:

- Although Defendants assert that Ms. Lee entered into an arbitration agreement when she began working at the Ritz-Carlton San Francisco, she did not. Even though she signed an Acknowledgment of the Employment Agreement, which contains an arbitration provision, the Acknowledgment *by itself* is not a valid agreement because it is missing material terms. The material terms are found in the Employment Agreement, but Ms. Lee does not remember being given a copy of that agreement.
- Even if the Acknowledgment were a sufficient stand-alone arbitration agreement, it is not enforceable here because (1) it applies only to the Ritz-Carlton, not other Marriott entities such as Westin hotels, and (2) it is unconscionable (both procedurally and substantively).

Finally, Ms. Lee asserts that there are procedural and legal reasons to deny the motion to compel arbitration. In particular, she argues that (1) Defendants waived the right to compel arbitration and (2) there is a federal law that allows a plaintiff in a suit related to sexual harassment to elect a judicial forum over an arbitral one.

5

C.   Contract Formation – Existence of Arbitration Agreement

As noted above, Defendants assert that Ms. Lee is party to an arbitration agreement. The evidence of record reflects that, in October 2015, Ms. Lee became the Director of Transient Sales at the Ritz-Carlton San Francisco. About a year later, while she was still working at the hotel in August 2016, she signed an "Acknowledgment of Agreement." *See* Shapiro Decl., Ex. B (signed Acknowledgment of Agreement). The Acknowledgment of Agreement is a part of a broader agreement, titled "The Ritz-Carlton Employee Agreement." Shapiro Decl., Ex. A (Employee Agreement, which has the Acknowledgment of Agreement at the very end). The Acknowledgment of Agreement is an acknowledgment of the Employee Agreement specifically.

The Employee Agreement states that it is "an agreement between The Ritz-Carlton Hotel Company, L.L.C. or a related entity ('The Ritz-Carlton' or 'the Company') and me." Shapiro Decl., Ex. A (Employee Agreement at 1). Page 3 of the Employee Agreement has a section on the company's "Internal Resolution Process," of which arbitration is one component. "Arbitration . . . is mandatory as to Covered Claims (as defined)." Shapiro Decl., Ex. A (Employee Agreement at 3). The subsection on arbitration begins on page 11. The Employee Agreement states that

> [m]ost employment-related claims are covered by this Agreement, including: wrongful termination claims; wage claims; contract claims; personal injury claims; tort claims; invasion of privacy claims; defamation claims; claims for employment discrimination based on age, sex, race, color, national origin, religion, disability (actual or perceived), gender identity, political affiliation or any other characteristic protected by applicable law; claims for harassment, including sexual harassment; and claims for violation of any federal, state, local or other governmental law, constitution, statute, regulation, or ordinance. In addition, questions related to procedure (including venue and choice of arbitrator), and arbitrability (that is whether an issue is subject to arbitration under this agreement) shall also be decided by the arbitrator. Essentially, this agreement to arbitrate covers any claim that a current or former employee has against The Ritz-Carlton ("Covered Claims") and any claim that The Ritz-Carlton has against a current or former employee.

Shapiro Decl., Ex. A (Employee Agreement at 12).

As indicated above, the Acknowledgment of Agreement comes at the end of the Employee Agreement. The Acknowledgment is a one-page document and states as follows:

> This is an agreement between me and The Ritz-Carlton and I agree

> to submit to final and binding arbitration all legal and/or equitable claims one may have against the other, including claims related in any way to my employment or the separation of my employment with The Ritz-Carlton, except those claims that are expressly excluded from the scope of this Agreement.
>
> This Agreement means that, instead of filing a complaint with a court, I *must* pursue arbitration if I wish to assert a Covered Claim based on any violation of statutory or common law, including but not limited to: wrongful termination claims; wage claims; contract claims; personal injury claims; tort claims; invasion of privacy claims; defamation claims; claims for employment discrimination based on age, sex, race, color, national origin, religion, disability (actual or perceived), gender identity, political affiliation or any other characteristic protected by applicable law; claims for harassment, including sexual harassment; and claims for violation of any federal, state, local or other governmental law, constitution, statute, regulation, or ordinance including without limitation claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act, the Fair Labor Standards Act, or the Family & Medical Leave Act.
>
> This Agreement also means that The Ritz-Carlton *must* pursue arbitration to assert Covered Claims against me, including but not limited to: misappropriation; theft; damage to property; defamation; contract claims; and tort claims.  The terms of the arbitration component of this Agreement are severable.  Accordingly enforceability of any provision shall not affect the application of any other provision.
>
> I agree that to the fullest extent allowed by applicable law, no court or arbitrator shall determine any Covered Claim on a class, collective, representative, and/or joint basis under any federal, state or local law.  I waive any right I may otherwise have to bring Covered Claims on a class, collective, representative, and/or joint basis.
>
> I understand that arbitration under this Agreement is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.
>
> I represent that I have read this Agreement and that I understand it and have had the opportunity to ask questions about it and to seek legal advice regarding it.  I hereby agree to the terms of this Agreement, and agree to uphold The Ritz-Carlton standards.  In return, The Ritz-Carlton promises to treat me with dignity and respect.  Upon the successful completion of my Introductory Period, I will receive the rights and benefits in this Agreement.
>
> ***I understand that by signing this Agreement, I am agreeing to arbitrate most employment-related claims and am waiving the right to a jury trial, the ability to bring a class or other aggregated claim, and the ability to file a lawsuit based on any claim that is covered by the Arbitration provision in this Agreement.***

Shapiro Decl., Ex. B (Acknowledgment of Agreement) (emphasis in original).

7

1    Ms. Lee signed the Acknowledgment of Agreement in August 2016. The
2    Acknowledgment she signed was also signed by Louie Shapiro, then then-Area Director of
3    Human Resources for the Ritz-Carlton San Francisco. *See* Shapiro Decl. ¶¶ 2, 8. According to
4    Mr. Shapiro:

- "While working at the Hotel from approximately December 2015 to January 2018, I provided an orientation and training program on the Employee Agreement, which included an arbitration agreement therein, to newly-transferred personnel, newly-hired personnel, or personnel at the Hotel that had not yet been given the orientation and training program and/or did not have a signed Acknowledgment of the Employee Agreement in their personal file." Shapiro Decl. ¶ 4. "As a matter of the Hotel's practice, the Employee Agreement was typically given to the subject personnel during the orientation and training program; however, copies of the Employee Agreement were maintained and held by the Hotel as a matter of practice." Shapiro Decl. ¶ 5.
- In August 2016, the Employee Agreement and Acknowledgment were given to such personnel during an orientation and training program, and personnel were instructed to sign the Acknowledgment. *See* Shapiro Decl. ¶ 6.
- Ms. Lee "was working at the Hotel in August 2016. As such, Ms. Lee was provided the April 2016 Employee Agreement and the Acknowledgement to the April 2016 Employee Agreement during the orientation and training program and was instructed to sign the Acknowledgement to the April 2016 Employee Agreement." Shapiro Decl. ¶ 7.

Ms. Lee does not dispute that she signed the Acknowledgment of Agreement. However, she asserts she "has no recollection of being presented with or reviewing a *complete* arbitration agreement in 2016. . . . I have no recollection of ever being shown [the Employee Agreement] or of anyone ever explaining the terms of an arbitration agreement to me." Lee Decl. ¶ 5 (emphasis added). Notwithstanding such, Ms. Lee admits to the following:

Louie Shapiro came to the Sales Office once with Liz Wong – a

8

> Human Resources Manager – and went quickly office to office with a clipboard requesting signatures. Generally speaking, Louie did not typically handle human resources paperwork so it did stick out to me as unusual. It was a quick process with Louie and Liz getting signatures. I remember Louie giving a quick elevator pitch overview of said document when they came to my office, and then requesting my signature on the spot. To my best memory, it was less than two minutes in total and I remember feeling rushed and caught off guard while in the middle of work at the time. Typically, when important HR matters were addressed, there would be calendared meetings and discussions about the issue. This was different. I had no idea what I was signing. I remember feeling uncomfortable not knowing what I was signing and not having enough time to read anything because they were both standing in front of my office waiting for me to sign their clipboard. I do not recall that either Louie or Liz gave me a copy of what I signed or that they gave me anything to read to help me understand what I was signing. To my knowledge, I was never given the full terms of an arbitration agreement. Whatever was said was general and not detailed.

Lee Decl. ¶ 6.

Because Ms. Lee purports not to remember being given the Employee Agreement, she maintains that, at most, she is subject to only the Acknowledgment, and not the broader Employee Agreement.

Whether Ms. Lee is subject to the Employee Agreement is a matter of contract formation. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'"). Contract formation is an issue for a court to decide. *See Ahlstrom v. DHI Mortg. Co., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021) ("[P]arties cannot delegate issues of formation to the arbitrator.").

The Court rejects Ms. Lee's contention that she is not subject to the Employee Agreement. Defendants have provided substantial evidence that Ms. Lee knew about and agreed to the Employee Agreement – *i.e.*, the Shapiro Declaration. Ms. Lee contends that the Shapiro Declaration should be given no consideration because "Mr. Shapiro provides no testimony that he personally witnessed Ms. Lee receiving the Employee Agreement or being instructed to sign it. Instead, he improperly infers a factual conclusion based on general office practices rather than his direct observation of specific events involving Ms. Lee." Opp'n at 6. But there is no requirement that a witness must have personally witnessed the signing of an agreement in order to establish

1  contract formation. That would certainly be direct evidence of contract formation, but nothing
2  prevents a party from relying on circumstantial evidence of contract formation – *i.e.*, a signature
3  on a contract that is not claimed to be forged. Indeed, one can imagine that a party will often have
4  to rely on indirect evidence of contract formation, for example, because an employee who did
5  witness the signing no longer works at the company. Parties may also rely on common pattern or
6  practice (*e.g.*, on the on-boarding process) to provide circumstantial evidence of happened on a
7  particular occasion if there is evidence that the practice was followed on that occasion.

8        The authority on which Ms. Lee relies is not to the contrary. For instance, in *Burgess v.*
9  *Qwest Corp.*, 546 F. Supp. 2d 1117 (D. Or. 2008), the plaintiff and the defendant had entered into
10 agreements under which the defendant would provide the plaintiff with telephone, cellular, and
11 internet services. The defendant moved to compel arbitration on the basis that the agreements
12 each contained an arbitration provision. The court did not compel arbitration because (1) there
13 was "no evidence, *such as a signed agreement* or documented communications with plaintiff, to
14 establish that plaintiff was aware of the terms of the [relevant] Agreement and agreed to them," *id.*
15 at 1120 (emphasis added), and (2) although the defendant submitted a declaration stating that,
16 "'[b]ased upon [the defendant's] standard business practices, plaintiff would have been required to
17 accept [the] terms [of the relevant contract] when she subscribed to this service,'" it did not
18 provide evidence to show that the "standard business practices were followed" with respect to the
19 plaintiff. *Id.* at 1121 (noting that "[d]efendant provides no evidence specific to the [phone] call
20 between plaintiff and defendant or the material actually provided to plaintiff so as to establish a
21 'meeting of the minds' between the parties"); *see also Campos v. Bluestem Brands, Inc.*, No. 3:15-
22 CV-00629-SI, 2015 U.S. Dist. LEXIS 132538, at *21-22 (D. Or. Sept. 30, 2015) (agreeing with
23 *Burgess* that "evidence of standard business practices [is] insufficient to establish mutual assent to
24 [an] arbitration agreement").

25       The instant case is distinguishable from *Burgess* because Marriott has provided a signed
26 Acknowledgment and Ms. Lee does not make any assertion that the signature on the
27 Acknowledgment is not hers or is forged. Furthermore, the Shapiro Declaration does provide
28 evidence showing that standard business practices were followed.

10

To the extent Ms. Lee relies on *Campos*, that decision actually weighs in Defendants' favor. In *Campos*, the court noted that the plaintiff had expressly testified she did not receive the agreement with the arbitration provision – *i.e.*, the plaintiff "offer[ed] *more* than an unsupported assertion that she does not remember getting the agreement in the mail." *Id.* at *323 (emphasis added). That is not the case here. In the case at bar, Ms. Lee has not unequivocally stated that she did not get a copy of the Employee Agreement. Instead, she has simply offered an unsupported assertion that she does not *remember* getting a copy of the Employee Agreement. *See* Lee Decl. ¶ 5 ("I have no recollection of being presented with or reviewing a complete arbitration agreement in 2016. I reviewed "The Ritz-Carlton Employee Agreement" labeled Exhibit A to the Shapiro Declaration in preparing this declaration. It appears to be a 15- to 16-page document. I have no recollection of ever being shown this document or of anyone ever explaining the terms of an arbitration agreement to me."). If anything, Ms. Lee's declaration indicates that she *was* given a copy of the Employee Agreement; she was simply (as claimed) rushed through the process of signing it. In short, Ms. Lee does not squarely contradict Defendants' assertion, along with the circumstantial evidence, that she was given the Employment Agreement.

To the extent Ms. Lee asserts she was rushed into signing, that might suggest procedural unconscionability of the agreement. But in her papers, Ms. Lee does not argue that, even if she *were* given a copy of the Employee Agreement, that agreement is unconscionable and therefore the arbitration agreement contained therein should not be enforced. Indeed, Ms. Lee has made no contention that the Employee Agreement is *substantively* unconscionable which would be necessary in order to render it invalid. *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 99 (2000) (noting that, under California law, both substantive and procedural unconscionability must be present). Instead, Ms. Lee's arguments of unconscionability are focused on the Acknowledgment of Agreement – that is, if it were a stand-alone agreement *independent* of the Employee Agreement. *See* Opp'n at 13-14.

Accordingly, the Court finds that Ms. Lee was subject to the Employee Agreement.

D. <u>Interpretation of Employee Agreement</u>

Although the Court finds that Ms. Lee is subject to the Employee Agreement – and the

11

agreement clearly contains an arbitration provision – that does not thereby mean Ms. Lee must be compelled to arbitration. This is because the Employee Agreement states that it is "an agreement between The Ritz-Carlton Hotel Company, L.L.C. **or a related entity** ('The Ritz-Carlton' or 'the Company') and me." Shapiro Decl., Ex. A (Employee Agreement at 1) (emphasis added).

Defendants here are not the Ritz-Carlton Hotel Company, L.L.C. Thus, in order for them to be able to invoke the arbitration provision in the Employee Agreement, they must be able to establish that they are a "related entity." Whether Defendants are a "related entity" of the Ritz-Carlton Hotel Company, L.L.C. is a matter of contract interpretation.

At the hearing on the motion to compel, the Court asked the parties to provide supplemental briefing and/or evidence about the Ritz-Carlton San Francisco and the Westin Maui in order to assess whether Defendants are a "related entity" for purposes of the Employee Agreement. The parties' filings indicate that the Ritz-Carlton San Francisco and the Westin Maui are not franchises, *see* Grygo Supp. Decl. ¶¶ 5, 7; Ladd Supp. Decl. ¶ 4, and that a Marriott entity manages each hotel. Specifically, the Ritz-Carlton Hotel Company, L.L.C. manages the Ritz-Carlton San Francisco (and generally the Ritz-Carlton brand), *see* Grygo Supp. Decl. ¶ 5, and the Starwood Hotels & Resorts Worldwide, L.L.C. (one of the named defendants) manages the Westin Maui (and generally the Westin brand). *See* Grygo Supp. Decl. ¶ 7. The Ritz-Carlton Hotel Company, L.L.C. paid Ms. Lee's wages when she worked at the Ritz-Carlton San Francisco, *see* Wells Supp. Decl. ¶ 4, and the Starwood Hotel & Resorts Worldwide, L.L.C. paid her wages when she worked at the Westin Maui. *See* Ladd Supp. Decl. ¶ 4. Thus, separate entities manage the two hotels, and paychecks come from the two separate entities. On the other hand, both the Ritz-Carlton Hotel Company, L.L.C and Starwood Hotel & Resorts Worldwide, L.L.C. are wholly owned subsidiaries of MII (another named defendant), *see* Grygo Supp. Decl. ¶ 4, and MII provides policies to be used in managed properties such as, but not limited to, the Ritz-Carlton Hotel Company, L.L.C and Starwood Hotel & Resorts Worldwide, L.L.C. *See* Grygo Supp. Decl. ¶¶ 5, 7.[2] In addition, managed properties such as, but not limited to, the Ritz-Carlton Hotel

---

[2] Ms. Lee has objected to Ms. Grygo's testimony about "the practices of all the entities prior to [her] start of employment at MII." Docket No. 47 (Obj. at 2). The objection is overruled. Ms.

12

Company, L.L.C and Starwood Hotel & Resorts Worldwide, L.L.C. offer common benefits. *See* Grygo Supp. Decl. ¶¶ 5, 7.

While the evidence above demonstrates that there is an affiliation between the Ritz-Carlton Hotel Company, L.L.C. and Defendants, that does not thereby mean that Defendants are a "related entity" within the meaning of the Employee Agreement. The term "related entity" appears ambiguous on its face. Ms. Lee suggests it means a Marriott entity related to the Ritz-Carlton brand. Defendants suggest it means any Marriott entity regardless of brand. Other than the evidence noted above, neither party has provided extrinsic evidence to interpret the agreement. *See Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008) (noting that extrinsic evidence is admissible to interpret an agreement when a material term is ambiguous). That evidence is not particularly probative to the contract interpretation question. However, there is intrinsic evidence which favors Ms. Lee's construction. First, the agreement is titled "The *Ritz-Carlton* Employee Agreement." It is not entitled a "Marriott" of "MII" Employment Agreement. Moreover, as a facial matter, it is highly questionable that agreeing to one Employee Agreement means that arbitration would extend to the multitude of worldwide entities that fall under the Marriott umbrella, particularly if those other properties had their own employment documents, policies, or processes. *See Saw v. Avago Techs. Ltd.*, 51 Cal. App. 5th 1102, 1110 (2020) ("Courts must examine the contract as a whole and should avoid 'a construction which leads to very unreasonable results … unless it is required by clear words and there is no other tenable construction.'"). Hence, the evidence supports Ms. Lee's interpretation more than Marriott's. Finally, under California law, any ambiguity in the term of a contract should be construed against the drafter of the agreement – in this case, against the company and not Ms. Lee. *See Breathe S. Cal. v. American Lung Assn.*, 88 Cal. App. 5th 1172, 1182 (2023) (stating that "'any ambiguities must be construed against' the drafter, where the uncertainty cannot be resolved by other rules of

---

Grygo implicitly educated herself on the practices of the entities prior to her start date. *See* Grygo Supp. Decl. ¶ 3 (testifying that her job responsibilities include "overall supervision of human resources matters and employment-related policies and benefits common to all managed properties within the Marriott Entities").

13

contract interpretation").

Defendants are not a "related entity" for purposes of "The Ritz-Carlton Employee Agreement." They cannot claim the benefit of the arbitration provision contained therein. The Court therefore denies Defendants' motion to compel arbitration.[3]

E.  **EFAA**

Even if, as Defendants argue, Ms. Lee were subject to the arbitration provision in the Employee Agreement, the Court would still deny Defendants' motion to compel because there is an independent basis for rejecting arbitration. Specifically, there is a federal law that allows a plaintiff in a suit related to sexual harassment to elect a judicial forum over an arbitral one.

The federal law at issue is the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"). The relevant text of the EFAA is as follows:

> Notwithstanding any other provision of this title [*i.e.*, Title 9 governing arbitration], at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a) (emphasis added). "The term 'predispute arbitration agreement' means any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." *Id.* § 401(1). "The term 'sexual harassment dispute' means a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4). The parties do not dispute that harassment based on sex includes harassment based on pregnancy. *Cf., e.g.*, *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) (noting that, "[u]nder the Pregnancy Discrimination Act provisions of Title VII, discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions is defined as a kind of sex discrimination and is prohibited"; citing 42 U.S.C. § 2000e(k)).

As an initial matter, the Court acknowledges that Ms. Lee has not asserted a cause of

---

[3] Given the Court's ruling here, it need not address the issue of whether there was a break in employment between the time that Ms. Lee worked at the Ritz-Carlton San Francisco and the time that she worked at the Westin Maui.

14

1  action for sexual harassment or hostile work environment (under Title VII or FEHA) in her
2  complaint. That fact, however, does not bar her from relying on the EFAA – and Defendants do
3  fundamentally dispute such. *See* Reply at 14 (but arguing that the Court "should [still] draw an
4  inference that Plaintiff herself did not believe that she was subject to sexual harassment sufficient
5  to state a claim because she did not include such a claim"). This is because the EFAA does not
6  refer to a "sexual harassment claim" or "sexual harassment cause of action," but rather a "sexual
7  harassment dispute." Moreover, several courts have rejected the argument that a plaintiff is barred
8  from invoking the EFAA simply "because none of her claims are styled as 'sexual harassment'
9  claims." *Delo v. Paul Taylor Dance Found.*, 685 F. Supp. 3d 173, 181 (S.D.N.Y. 2023). (In *Delo*,
10 the plaintiff in the case had asserted claims for retaliation, gender discrimination, and familial
11 status discrimination.) The *Delo* court noted:

> It is a well-established principle that, when evaluating the viability of a complaint, courts focus on the substance of the factual allegations and not how the causes of action are labeled. And there is nothing in the text of the EFAA that suggests its applicability hinges on how a claim is labeled. To the contrary, § 401 appears to define "sexual harassment dispute" broadly, requiring only that the claim "relates to" conduct that, as alleged, "constitutes" sexual harassment under applicable law.

17 *Id.*; *see also Doe v. Celebrity Cruises, Inc.*, No. 25-CV-21035-RAR, 2025 U.S. Dist. LEXIS
18 139046, at *11-13 (S.D. Fla. July 21, 2025) (emphasizing that "Congress wrote the EFAA to
19 apply when a plaintiff alleges a sexual assault *dispute*, not . . . when a plaintiff pleads a specific
20 sexual assault *claim*" (emphasis in original); *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*,
21 746 F. Supp. 3d 135, 150 (S.D.N.Y. 2024) (agreeing with *Delo* that "a plaintiff need not 'style[]'
22 or 'label[]' a cause of action as one for sexual harassment to invoke the EFAA"); *cf. Diaz-Roa v.*
23 *Hermes Law PC*, 757 F. Supp. 3d 498, 534 (S.D.N.Y. 2023) (stating that, "[f]rom a textual
24 perspective, the statutory language does not require the person seeking to avoid the effect of an
25 otherwise applicable arbitration clause to plead a claim for sexual assault or sexual harassment").
26         Defendants do argue, however, that the EFAA is not applicable to the instant case because

15

1  Ms. Lee has not plausibly alleged that sexual harassment took place.[4]  In her papers, Ms. Lee
2  contends that she has plausibly alleged sexual harassment because she has made allegations about

> a systematic campaign of harassment specifically targeting her pregnancy, childbirth, and status as a working mother that began with her prior manager Lana Uytterhagen's attempts to force her resignation before maternity leave and continued with Defendant Spurrier's repeated statements expressing resentment toward "everyday Mom" employees,[5] his demands that she work during maternity leave while interviewing her as if for a new position, the immediate imposition of discriminatory travel requirements upon her return from maternity leave, and the systematic exclusion and marginalization designed to force her resignation.

Opp'n at 19-20.

In response, Defendants contend that Ms. Lee has collapsed the distinction between harassment and discrimination.  According to Defendants, the alleged misconduct identified by Ms. Lee are largely personnel decisions and therefore – as alleged – constitute discrimination, not harassment (which is about a social environment).  *See* Reply at 11-12.  *See, e.g.*, *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 708 (2009) (stating that "harassment is generally concerned with the *message* conveyed to an employee, and therefore with the social environment of the workplace, whereas discrimination is concerned with the explicit changes in the terms or conditions of employment") (emphasis in original).  Defendants maintain that the only conduct

---

[4] Some courts have disagreed that the proper benchmark is plausibility, applying instead a more lenient standard of nonfrivolous allegations of sexual harassment. *Compare, e.g.*, *Diaz-Roa*, 757 F. Supp. 3d at 533 (holding that "a plaintiff need only plead nonfrivolous claims relating to sexual assault or to conduct alleged to constitute sexual harassment, with the sufficiency of those claims to be reserved for proper merits adjudication, be it a motion to dismiss, motion for judgment on the pleadings, motion for summary judgment, or trial"); *Solis v. Prime Comms Retail, LLC*, No. 5:24-cv-02389-AH-(SHKx), 2025 U.S. Dist. LEXIS 66307, at *5-6 (C.D. Cal. Apr. 7, 2025) (agreeing with *Diaz-Roa*), *with Van De Hey v. EPAM Sys.*, No. 24-cv-08800-RFL, 2025 U.S. Dist. LEXIS 48775, at *8-9 (N.D. Cal. Feb. 28, 2025) (applying plausibility standard because, *e.g.*, "reading the EFAA to void arbitration agreements even where a plaintiff cannot plausibly plead a claim for sexual harassment could incentivize the bringing of 'facially unsustainable' claims as a mechanism to evade otherwise binding arbitration agreements").

In the instant case, however, both parties have applied the plausibility standard.  *See, e.g.*, Opp'n at 19 ("Plaintiff's Allegations Plausibly State Sexual Harassment Under California Law.").

[5] *See* Compl. ¶ 79 (alleging that Mr. Spurrier "repeatedly told [Ms.] Lee and the greater Sales Team" that he resented his prior manager "for a long time because she was an 'everyday Mom'" which meant that he had to "pick[] up the slack for her" and could only be a "'Saturday Dad'").

that could arguably relate a hostile work environment is Mr. Spurrier's comments about "everyday Moms" and "Saturday Dads"; but such comments, Defendants argue, do not constitute severe or pervasive misconduct that gives rise to a hostile work environment.

      Defendants' position is problematic for two reasons. First, in *Roby*, the California Supreme Court expressly acknowledged that, "in some cases the hostile message that constitutes the harassment is *conveyed* through official *employment actions*, and therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim." *Id.* (emphasis added; also stating that, "in analyzing the sufficiency of evidence in support of a harassment claim, there is no basis for excluding evidence of biased personnel management actions so long as that evidence is relevant to prove the communication of a hostile message"). Defendants suggest that *Roby* "did not relieve Plaintiff or her duty to allege severe and pervasive harassment, *separate and apart* from the personnel issues about which she also complains." Reply at 14 (emphasis added). But they do not cite to any part of *Roby* to support this proposition. Although the harassment in *Roby* did include harassing conduct apart from official employment actions, *see Roby*, 47 Cal. 4th at 709 (noting, *e.g.*, that comments were made about plaintiff's body odor and arm sores), the California Supreme Court did not hold that such conduct is essential to support a harassment claim,[6] let alone that such conduct be severe or pervasive in and of itself before official employment actions may be considered. In any event, as noted above, Ms. Lee does cite comments which did not constitute employment actions but did arguably contain a harassing message. To the extent Defendants contend that personnel decisions convey a hostile message only when there is "a widespread pattern of bias," *id.*, Ms. Lee has plausibly alleged such, especially given the conduct of both Ms. Uytterhagen and Mr. Spurrier. *Cf. Kovalenko v. Kirkland & Ellis LLP*, No. No. 22-cv-05990-HSG, 2023 U.S. Dist. LEXIS 148503, at *21-22 (N.D. Cal. Aug. 23, 2023) ("[Plaintiff] essentially alleges that Defendants consistently gave male associates preferential treatment at her own expense. . . . Whether these allegations will ultimately

---

[6] Defendants have cited additional authorities in their supplemental brief, but none is binding or particularly compelling. *See* Docket No. 45 (Defs.' Supp. Br. at 5-8) (citing California district court opinions and an unpublished California appellate court opinion).

17

support a hostile work environment claim is a factual question properly answered at a later stage.").

Second, even if Defendants were correct in their analysis, their analysis is focused on what constitutes sexual harassment under California law only. They have not cited to any authorities suggesting that there is such a hard line between what constitutes harassment and discrimination under federal law. *Cf. O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) (cautioning that "courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct"); *John v. Wal-Mart Store 2585*, No. 3:21-cv-01285 (MPS), 2024 U.S. Dist. LEXIS 38969, at *30-31 (D. Conn. Mar. 6, 2024) (taking note of evidence that defendant treated white employees more favorably than black employees – *e.g.*, assigning work with more resources and making scheduling accommodations; "[t]hough these incidents are not suggestive of 'discrimination, intimidation, ridicule, [or] insult,' they do evidence disparate treatment, which may, together with other evidence, contribute to a hostile work environment claim"). As indicated above, the EFAA contemplates that a sexual harassment dispute can be predicated on federal law, not just state law. *See* 9 U.S.C. § 401(4) ("The term 'sexual harassment dispute' means a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."). Admittedly, Ms. Lee's opposition brief did focus on what constitutes sexual harassment under California law. *See* Opp'n at 19. But Ms. Lee's case is predicated on Title VII and not just FEHA.

As a final contention, Defendants assert that, "[e]ven if the Court can find a sexual harassment dispute somewhere in the Complaint, that claim should remain in court while Plaintiff's core claims of discrimination . . . and making complaints about the same are arbitrated. . . . [I]f anything, harassment is a side claim, and should not be permitted to drag her entire Complaint about other claims out of arbitration." Reply at 14-15. But Defendants do not explain how this could be done given that (1) Ms. Lee has not asserted a specific cause of action for harassment and (2) the harassment alleged is predicated in part on the discrimination. Moreover, Defendants give short shrift to the language of EFAA which provides that "no predispute

18

arbitration agreement . . . shall be valid or enforceable with respect to a *case* which is filed under Federal, Tribal, or State law and *relates* to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a) (emphasis added). The use of the word "case" instead of "claim" or "cause of action" weighs against Defendants' position. *See Ding v. Structure Therapeutics, Inc.*, 755 F. Supp. 3d 1200, 1218-19 (N.D. Cal. 2024) (noting that text of statute refers to "case" and not "claim"). In *Ding*, Judge Corley noted that, "when a complaint includes at least one EFAA covered claim, and the plaintiff elects to invalidate the arbitration agreement, the agreement is invalid as to the whole 'case' to the extent the claims relate to the EFAA-covered dispute." *Id.*; *see also Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 559 (S.D.N.Y. 2023) (stating that "the text of § 402(a) makes clear that its invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute (for example, a claim of unlawful retaliation for a report of sexual harassment)").

Accordingly, because of the EFAA, the Court also denies Defendants' motion to compel arbitration, even if the arbitration agreement were applied to Ms. Lee.

### III.     CONCLUSION

Although Ms. Lee entered into an agreement to arbitrate with the Ritz-Carlton Hotel Company, L.L.C. or a related entity, Defendants are not a related entity for purposes of the Employee Agreement. Thus, there was no agreement to arbitrate with respect to Ms. Lee's employment at the Westin Maui. Furthermore, even if Ms. Lee's employment at the Westin Maui were covered by the arbitration agreement, the EFAA allows her to elect a judicial forum. The Court therefore denies Defendants' motion to compel arbitration.

This order disposes of Docket No. 33.

**IT IS SO ORDERED**.

Dated: September 21, 2025

_____
EDWARD M. CHEN
United States District Judge

19